**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSE DE HOYOS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 3647** |
| | ) | |
| **NORTHEAST ILLINOIS REGIONAL** | ) | |
| **COMMUTER RAILROAD CORP.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Jose De Hoyos has sued his former employer, Northeast Illinois Regional Commuter Railroad Corporation—which does business as Metra—for discrimination based on his disability, specifically, depression and the side effects caused by medication prescribed for the depression. De Hoyos asserts three claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12117(a): failure to accommodate (count 1), unlawful termination (count 2), and retaliation (count 3). De Hoyos also asserts the same three claims under the Illinois Human Rights Act, 775 ILCS 5/1, which is the Illinois analog to the ADA (counts 4, 5, and 6).[1] Metra has moved for summary judgment on all of De Hoyos's claims. For the reasons below, the Court grants Metra's motion as to counts 2, 3, 5, and 6 but denies the motion as to counts 1 and 4.

---

[1] Both parties appear to agree that claims brought under the IHRA are governed by the same standards as claims under parallel federal discrimination statutes. The Court therefore considers similar ADA and IHRA counts together for the purpose of summary judgment.

## Background

The following facts are undisputed unless otherwise noted.[2]

### A.      Metra and relevant employees

Metra operates a public commuter rail system serving a six-county region in northeast Illinois.  It is organized under the Regional Transportation Authority Act, 70 ILCS 3615/1.02.

In August and September 2019, Larry Powell was the Senior Director of Engineering and Maintenance, John Meyer was the Director of the Milwaukee District Engineering Department, and Jim Walsh and Thomas Swoyer were the Signal Supervisors for the Milwaukee District Engineering Department.  Walsh and Swoyer reported to Meyer, and Meyer reported to Powell.  At that time, De Hoyos reported directly to Walsh and Swoyer, and thus indirectly to Meyer and Powell.  Nicole Lang was the Manager of Medical Service Programs at Metra.

### B.      De Hoyos's roles at Metra and the union's bidding/bumping process

In 2011, De Hoyos first began working for Metra as a signalman in the Signal Department.  As a signalman, De Hoyos was a member of the Brotherhood of Railroad Signalmen (BRS), and the terms and conditions of his employment were governed by the collective bargaining agreement (CBA) between Metra and the union.

The CBA maintains a seniority system for BRS signalmen that gives more senior

---

[2] Metra points out that De Hoyos's response and his Local Rule 56.1 statement do not comply with the requirements of the rule, and it contends that the Court should treat all improperly controverted factual statements as admitted.  Def.'s Reply at 12–13 (citing *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009)).  Where appropriate, the Court notes what evidence it relies upon in making its decision and ignores evidence that does not comport with the requirements of the Local Rules.

signalmen a preference in job assignments. A "bid" is when a signalman chooses to work a job that is vacant, meaning no other signalman is assigned to the job. A bid can be placed from anywhere.[3] De Hoyos, Walsh, and Meyer all testified that to determine what jobs are available for bid a signalman may (and they often do) call the union. Metra also posts job bulletins showing available positions at its facilities.

Under Rule 33 of the CBA, a more senior signalman can also displace a junior signalman from his position. A junior signalman who is displaced from his job by a more senior signalman is given the right to exercise his seniority by displacing another signalman with even less seniority. This is referred to as a "bump."

On March 15, 2019, De Hoyos began working as a signal maintainer on the Metra Electric District, which runs from downtown Chicago to the south suburbs. But De Hoyos preferred a different position, namely, vacation relief signal maintainer in Milwaukee District North.

During the summer of 2019, De Hoyos texted his then-former supervisor, Walsh, the following series of messages regarding the vacation relief position:

- April 30, 2019: "I might bid back if one of the vacation guys bid out. Make some extra money for the summer. It's to [sic] quiet down here. . . . I'll bid back. This is close but not for me. It's a country club retirement job in a bad area lol . . ." Def.'s Mot. for Summ. J, Ex. 12 at 40.

- June 27, 2019: "What's up boss man!! Hope you and the family have been great No ones bidding off vacation relief I see. ":( I want to come back. Lol your [sic] treating them to [sic] good." *Id.* at 42.

- July 23, 2019: "Are you going to put me back on vacation relief job boss?? I'll bid the cdl job Antonio bid off of. And then give up my cdl to get back to vacation relief." *Id.* at 42.

---

[3] "Q. Where do employees submit their bids from? A. From? Wherever they want. I don't understand that question. I can submit it from my house. I can submit it from my office. I can submit it from my car. Wherever I want." Walsh Dep. at 124:21-25.

In late July 2019, another signalman vacated the Milwaukee District North CDL (commercial driver's license) signalman driver position. De Hoyos bid for the position and was awarded it.

Appendix K the CBA governs signalman jobs that require a CDL. Appendix K states, in relevant part:

> Employees *without the applicable CDL at the time of exercising seniority* will have thirty (30) calendar days, from the day they first perform service on the position, to receive the required license provided, one of the two positions mentioned above is held by an employee holding a CDL or another member of the same gang holds a CDL. If the employee fails to obtain the CDL within the thirty (30) day period, they will be disqualified and the position will be rebulletined.

Def.'s Resp. to Pl.'s LR 56.1 SOF, Ex. 22 at K-1 (emphasis added). Meyer and Walsh both testified that this rule is not consistently followed. At the time De Hoyos bid on and was awarded the CDL signalman driver position, he already had a valid CDL issued by the state of Indiana.

## C. Metra's medical department and safety protocols

Metra contracts with Concentra, a health care company of physicians and other medical care providers, for medical examinations of its employees. Concentra also provides Metra with a non-exhaustive list of medications that describes whether the medication can be taken safely by an employee during work hours.

Certain positions at Metra are safety-sensitive. Lang—who, as indicated, was the Manager of Medical Service Programs—testified that this includes "[a]nyone who is in an FRA, or Federal Railroad Administration, or DOT, Department of Transportation, regulated position. Anyone that works around live tracks or in a yard . . . [and] anyone

4

that is responsible for train movement or the operation of trains." Lang Dep. 29:15-20. Signalman is a safety-sensitive position.

Employees in a safety-sensitive position must report to Metra's medical department their use of medications that could impact their ability to perform their job safely. This is done via an "On-Duty Use of Medication" form. When the medical department receives such a report from an employee, it will consult the list of medications provided by Concentra to determine what, if any, restrictions should be placed on the employee's work. If the medication is not on the Concentra list, the medical department will look up the medication. The completed "On-Duty Use of Medication" form is kept in a locked cabinet in the medical department but may be shared with the employee's supervisor if the employee makes such a request.

Lang also testified that if her department "receive[s] documentation from a physician that states that an employee cannot perform their job, then [Metra's medical department] would not let them perform their job based on the physician's designation of their restrictions." Lang Dep. 13:19-23. If, due to a medical issue, an employee has been taken out of service—or placed on a medical hold pending further examination— the medical department issues a memorandum to the employee's supervisors notifying them that the employee may not work until cleared by the medical department. Following a fitness for duty or return to work examination, the medical department will update the employee's supervisors, via another memorandum, regarding whether—and under what restrictions—the employee may return to work.

Because an employee's medical information is held only by the medical department—and because Metra supervisors are not qualified to make medical

determinations—Metra supervisors rely upon the medical department to inform them about whether an employee has been medically cleared to return to work.

**D.      De Hoyos's depression**

De Hoyos testified during his October 4, 2022 deposition that he has been diagnosed with depression and prescribed medication for it.  Regarding the affect his depression has on his life, De Hoyos testified to the following:

> Q. How does your depression affect your day-to-day life?
> A. Just it's more with sleeping.  At times it makes me feel lethargic, just out of it.
> Q. How does it affect your sleeping?
> A. I have trouble getting consistent sleep at times untreated.  I just struggle with a sound sleep and feeling rested.
> Q. When you say consistent sleep, I don't want to put words in your mouth, but what does that mean?
> A. I could sleep great one day and not maybe for a few weeks and then a couple of days not sleep well.
> Q. And how does the lack of sleep affect your day-to-day life?
> A. Sometimes I would feel sluggish, and other days I feel great.
> Q. Does it affect your ability to work?
> A. No, I use Modafinil.  That helps with that.

De Hoyos Oct. 2022 Dep. at 124:3-23.  He also testified that his depression affects "the way [he] handled emotions, sexually with [his] wife and intimacy it has tolled, communications with loved ones, family friends at times."  *Id.* at 126:19-22.  De Hoyos further testified that his depression sometimes causes him to procrastinate in doing household chores.  De Hoyos testified that Modafinil, his prescribed medication, is a stimulant that makes him feel "alert, well-rested and clear minded."  *Id.* at 125:15-16.

On August 7, 2019, De Hoyos was prescribed a new medication, Abilify, for his depression.  De Hoyos was scheduled to begin working in the CDL signalman driver position four days later, on August 12, 2019.

**E.     De Hoyos loses his CDL and is temporarily taken out of service**

On August 12, 2019, De Hoyos's first day in the CDL signalman position, he underwent a DOT physical examination, which is required to maintain a CDL.  During the physical, De Hoyos reported dizziness, disorientation, and fatigue as side effects that he had been experiencing from taking Abilify.  As a result, the physician performing the physical rescinded De Hoyos's medical clearance to hold a CDL.

On August 13, 2019, De Hoyos sent his supervisor Walsh—via text message—a medication approval form that indicated that he began taking the new medication(s) on August 6, with the name(s) and dosage(s) of the medication(s) blacked out.  De Hoyos also texted Walsh a medical examiner's certificate showing that he no longer held a CDL due to medication-related side effects.  Neither document listed the specific medication(s) or the conditions for which De Hoyos was taking the medication(s).

Walsh called and spoke to Metra's medical department, specifically Lang, about De Hoyos's side effects.  On August 20, 2019, Lang sent De Hoyos an e-mail stating:

> We are in receipt of the medical documentation you provided to your supervisors last week regarding your ability to hold a CDL license.  It looks as though your healthcare provider is disqualifying you from holding a CDL position due to the side effects of your medication.  Due to the fact that you're experiencing "disorientation, dizziness, and fatigue" as a result of taking your current medication and you work in a safety sensitive position, we have scheduled a fitness for duty exam when you return from vacation.  This is to determine if you are able to perform the safety sensitive functions of your job.  The intent of the fitness for duty exam is not for your supervisors to gain access to your medication list.  They have not been given a copy of your medications, nor will they be given a copy of your medications once you see the company doctor.  This is strictly to ensure you are able to safely perform all of your job duties.

Pl.'s LR 56.1 SOF, Ex. L.

On August 29, 2019, De Hoyos's fitness for duty examination took place.  The

outcome was that De Hoyos was placed on a medical hold until additional documentation and/or testing could be completed to determine whether he could continue working the CDL signalman driver position.  Concentra issued a report that stated that, "Based on today's examination, our medical provider was unable to approve this individual for the position."  Pl.'s LR 56.1 SOF, Ex. D.  Specifically, the Concentra physician required a note from De Hoyos's treating doctor to confirm that he was no longer taking the medication that caused the reported side effects.  The report from his examination also stated that De Hoyos could "work only with the following limitations/restrictions: He will need a new DOT physical if his job title requires DOT certification, as he was previously disqualified."  *Id*.

At some point that same day (August 29)—it is not clear from the record exactly when—Lang sent a memorandum to De Hoyos's supervisors stating that, based on the results of his fitness for duty examination, he needed to be removed from service.  De Hoyos and Lang exchanged e-mails from approximately 12:10 PM to 2:29 PM regarding his plans to go back to his doctor to obtain a note confirming that he was no longer taking the side effect-causing medication.  Lang told De Hoyos that Concentra would need to review the paperwork upon receiving it to make a determination about returning him to service, and that De Hoyos therefore may "have to wait a minute for an answer." Pl.'s LR 56.1 SOF, Ex. M.

Still on August 29, at 4:37 PM, De Hoyos sent his doctor's note to Concentra, Lang, and Meyer.  The note, on letterhead that stated "Mid-American Mental Health LLC," stated, "Was seen in my office today.  His Abilify has been discontinued."  Pl.'s LR 56.1 SOF, Ex. B.

The following day, August 30, 2019, between 8:00 and 9:00 AM, De Hoyos sent Lang several e-mails asking whether she had received any updates from Concentra regarding his status since he had submitted the doctor's note the previous afternoon. As of 8:39 AM, Lang told De Hoyos that she did not yet have an answer. At 9:54 AM, De Hoyos sent Lang an e-mail saying:

> I was asked to leave Western Ave since I'm not cleared. Anytime anyone returns from duty we start at Western or wherever our headquarters is and we get a ride to the doctor to get cleared. So now I guess I'm driving myself to the company doctor since I'm not allowed at Western Ave. I thought sending the paperwork in as soon as I got it would expedite things. So I'm headed to the Metra Dr now.

Pl.'s LR 56.1 SOF, Ex. L. Between 11:00 and 11:45 AM, Lang and De Hoyos exchanged another series of e-mails regarding De Hoyos's updated status. Lang informed De Hoyos that he would need to get another DOT physical to have his CDL reinstated in order to return to his current position.

Later that same day, at 12:39 PM, Lang sent an e-mail to De Hoyos's supervisors stating that De Hoyos was:

> currently cleared to come back to work **with the restriction** that he must receive another DOT physical to reinstate his CDL license per his job requirements. As soon as he gets a DOT physical and we receive documentation that he has passed, we can return him to his current position. I was informed by Labor Relations that he has two options: either receive and pass the DOT physical and return to his current position or he can elect to give up his CDL and bid on an open position, but he would have to wait until he is awarded the position to return to work. I just got off the phone with Mr. De Hoyos and informed him of the information above. He stated he wants to drop his CDL so I told him to call me if he had any questions. Currently, he is still off until we receive the necessary paperwork or he bids/is awarded another job.

Pl.'s LR 56.1 SOF, Ex. E.[4] Then, at 5:30 PM, De Hoyos sent Meyer an e-mail attaching

---

[4] On September 4, 2019, Lang sent a memorandum memorializing the same

a photo of his regular driver's license and explaining that it was "becoming a problem to maintain [his CDL] with high blood pressure and other medications." Pl.'s LR 56.1 SOF, Ex. H. The e-mail further stated, "I'm still confused why I wasn't given the opportunity to work today and this weekend given I corrected the issues that put me out of service yesterday." *Id.*

**F.     De Hoyos's attempts to return to service**

On August 31 at 4:35 PM, De Hoyos wrote an e-mail to Meyer stating that the union told him he should report to work on Tuesday, September 3. Meyer replied at 6:35 PM stating "you are not to return to work, I was told you were talked to." Pl.'s LR 56.1 SOF, Ex. O. At around 8:49 PM that night, Lang e-mailed Meyer asking him to instruct De Hoyos's supervisors—Walsh and Swoyer—that he must not to return to work until he or they receive a release from the medical department. Lang wrote further:

> Metra's doctor released him with the caveat that if his position requires a CDL, he has to take the DOT physical again. The information I received from Tom Swoyer is that his position requires a CDL. He has to either get the physical or he has to sit out and wait while he bids to be awarded another position – that information I received directly from labor relations on Friday.

Meyer Dep. at 149:4-12. At 8:53 PM, Meyer forwarded Lang's instructions to Walsh and Swoyer. Both Walsh and Swoyer testified during their depositions that they received those instructions.

On September 1, 2019, De Hoyos replied to Meyer's e-mail from the night before saying, "I'm cleared for work. Me having a cdl or not having a cdl is not grounds for me missing work. I forfeited my cdl. So now medical has no say in the matter just rh [sic]."

---

information in her August 30 email to "close the loop" on informing De Hoyos's supervisors that he had been medically cleared for work subject to some restrictions.

Pl.'s LR 56.1 SOF, Ex. O.  Meyer again told De Hoyos, "You are not to return to work until cleared by medical , one solution is to bid on an open job no bump in these situations."  *Id.*

On September 2, 2019, at 9:08 PM, De Hoyos sent an e-mail to Meyer, Lang, and Walsh reiterating that he was advised by the union to show up to work the following morning.

The following morning, September 3, 2019, De Hoyos showed up to work at the Western Avenue facility and clocked in.  De Hoyos met Swoyer in his office.  Swoyer testified that he told De Hoyos multiple times that he needed to leave, as he was not cleared by medical to be there.  Swoyer further testified that De Hoyos told him that he was there because the union told him that he needed to report to work.  Swoyer testified that he didn't recall exactly how he responded to De Hoyos's rationale, but that it was likely "[he] would've said the union doesn't have the authority to tell you to come to work when you've been told by supervision not to come to work."  Swoyer Dep. at 150:12-15.

Swoyer testified that he spoke on the phone both with De Hoyos's union representative and with Powell.  Swoyer testified that Powell called to remind him that De Hoyos was not supposed to be at work, in case he were to show up reporting for duty.  Swoyer further testified that he informed Powell that De Hoyos had already shown up and been asked to leave several times and but had not yet left.  Swoyer testified that Powell instructed him to ask De Hoyos to leave one more time, and if De Hoyos refused to leave, that Swoyer should ask the police to escort De Hoyos off the property. Powell's testimony during his deposition about this series of events largely echoed Swoyer's, with the addition that he also told Swoyer that De Hoyos could be considered

insubordinate if he did not leave.[5]  Because De Hoyos did not leave when asked again, Swoyer testified that he walked down the hall to the on-site Metra police office and requested that De Hoyos be escorted off the property.  De Hoyos testified that he complied and calmly left the premises.

On September 5, 2019, at 6:16 AM, De Hoyos wrote Meyer an e-mail asking who he needed to speak to regarding his current options.  Meyer replied, "I was told you need to go to an open job that is not cdl, on this district we have Fox Lake and Rondout Maintainers afternoons available, electric and RI have no open jobs, open job signalman wire shop capitol gang."  Pl.'s LR 56.1 SOF, Ex. Q.

## G.    De Hoyos's termination

Rule 53 of the CBA gives signalmen the right to a fair and impartial investigation prior to being disciplined.  The signalman must be given 72 hours' notice of the charges against him.  The investigation must be held within 10 days of the date the signalman's immediate supervisor has knowledge of the offense.

On September 5, 2019—two days after he was escorted off the Western Avenue facility—Metra removed De Hoyos from service and instructed him to attend a formal investigation relating to his acts of insubordination on the morning of September 3.

On September 9, 2019, after undergoing another DOT physical, De Hoyos was medically cleared for his CDL reinstatement.

After being postponed once, De Hoyos's investigation proceeded on September 11.  On September 18, Metra informed De Hoyos in writing that his employment was

---

[5] Powell also could not recall whether he initially called Swoyer or if Swoyer had called him.

terminated because of, "[his] blatant disregard to [sic] the rules that have been set forth by the carrier."  Def.'s Mot. for Summ. J, Ex. 17 at 2.  De Hoyos disputes the veracity of Metra's stated reason for his termination.

De Hoyos appealed his termination through his union's arbitration process, and on September 19, 2022, the National Railroad Adjustment Board denied De Hoyos's appeal.  The Board found that De Hoyos had been "confrontational" on September 3 and that "[Metra] ha[d] established that [De Hoyos] was insubordinate."  Def.'s Mot. for Summ. J, Ex. 19 at 4.[6]

## H.     Metra's Reasonable Accommodation Procedure

Metra maintains a Reasonable Accommodation Procedure, which states that "[t]o initiate the process, employees may: a. Make a declaration of disability on a Reasonable Accommodation Disability Declaration Form (Exhibit A) provided by Human Resources (HR) Medical Services; or b. Notify their managers that they need accommodations at work for medical conditions."  Pl.'s LR 56.1 SOF, Ex. A at 2.  The procedure also provides that "managers have a responsibility to initiate the interactive process when they observe or become aware of employees' needs for accommodations."  *Id.* at 1.

It is undisputed that Metra's Reasonable Accommodation Committee never reviewed De Hoyos's case to consider if he should be given an accommodation and that De Hoyos never "declared" that he had a disability.  De Hoyos's supervisors all testified that they never received any information or observed anything that would indicate to

_____

[6] De Hoyos objects to the relevance of these facts as well as the substance/merit of the Board's award.  He does not, however, dispute that his appeal was denied or that the quoted language appears in the Board's award.

them that De Hoyos had depression or any other disability and that De Hoyos never requested any modifications to his job duties.  Walsh further testified that he merely received information that De Hoyos was experiencing certain side effects from some undisclosed medication, and based on that, Walsh informed the medical department due to his concerns regarding safety.

**I.     De Hoyos's lawsuit**

Following his termination, De Hoyos filed a charge of discrimination with both the Equal Employment Opportunity Commission and the Illinois Department of Human Rights.  On April 13, 2021 and June 11, 2021, respectively, De Hoyos was issued right-to-sue letters.  Shortly thereafter, on July 9, 2021, De Hoyos filed the present lawsuit.

**Discussion**

To prevail on its motion for summary judgment, Metra must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party."  *Egonmwan v. Cook Cnty. Sheriff's Dep't.*, 602 F.3d 845, 849 (7th Cir. 2010) (quotation marks omitted).  For a claim of employment discrimination, then, the question the Court must ask is whether "the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

**A.     Failure to accommodate claims – counts 1 and 4**

In counts 1 and 4, De Hoyos alleges that Metra violated the ADA (count 1) and the IHRA (count 4) by failing to accommodate his depression.  Under the ADA, an

employer's failure to make reasonable accommodations for the known limitations of a disabled employee constitutes prohibited discrimination. 42 U.S.C. § 12112(a), (b)(5)(A). "A claim for failure to accommodate under the ADA . . . requires proof (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of his disability; and (3) defendant failed to accommodate his disability reasonably." *Scheidler v. State of Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). Metra contends that De Hoyos cannot prove any of these elements.

**1.      Disabled within the meaning of the ADA**

A disability is defined under the ADA as: (a) a physical or mental impairment that substantially limits one or more major life activities of the individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(1). Metra asserts that De Hoyos has not shown that the medical condition it contends is at issue—his depression—substantially limited a major life activity. There is, however, evidence indicating otherwise. De Hoyos testified during his deposition that his depression affected his sleep, his emotions, his communication, his relationships, and his ability to focus on and execute household chores. He further testified that his depression made him "feel lethargic and out of it" and "sluggish." De Hoyos Oct. 2022 Dep. at 124:3-23.

Sleeping, communicating, and concentrating are major life activities, 42 U.S.C. § 12102(2), and a person with an impairment that limits those activities is disabled "even if the impairment is 'transitory and minor.'" *Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013) (quoting 42 U.S.C. 12101(3)(B)). An individual's own claims that his condition "substantially interfered with h[is] ability to [perform major life activities]

15

. . . are sufficient to support [his] claim that []he has a disability." *Rowlands v. United Parcel Serv. – Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018).  Thus De Hoyos's testimony is sufficient to permit a reasonable jury to find that he has a disability within the meaning of the ADA.  Moreover, Metra's contention that De Hoyos's sleep was not sufficiently limited to be considered disabling relies on outdated precedent that has been rendered obsolete by the less exacting "substantially limits" standards provided by the ADA Amendments Act of 2008.

De Hoyos also argues that the treatment of his disability—specifically, the side effects he experienced from the prescribed medication Abilify—was itself disabling within the meaning of the ADA.  *See Christian v. St. Anthony Med. Ctr.*, 117 F.3d 1051, 1052 (7th Cir. 1997) ("if a medical condition that is not itself disabling nevertheless requires, in the prudent judgment of the medical profession, treatment that is disabling, then the individual has a disability within the meaning of the Act"); *Lesniak v. Quality Control Corp.*, No. 07 C 2948, 2009 WL 799487, at *8 (N.D. Ill. Mar. 25, 2009).  *See also, e.g.*, *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 186-87 (3d Cir. 2010) (collecting cases).  Metra does not argue otherwise in its reply and thus has effectively conceded the point.  *See Cincinnati Ins. Co. v. Eastern Atlantic Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) (failure to respond to nonfrivolous arguments operates as a waiver).  A reasonable jury could find that the side effects De Hoyos experienced from his prescribed Abilify—disorientation, dizziness, and fatigue—substantially impaired him in the major life activity of working, if nothing else.  *Peters v. City of Mauston*, 311 F.3d 835, 843 (7th Cir. 2002) ("working constitutes a major life activity under the ADA and the Rehab Act.").

### 2. Awareness of De Hoyos's disability

An employer only violates the ADA if it fails to provide "reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A) (emphasis added). "The ADA imposes on an employee the 'initial duty to inform the employer of a disability.'" *E.E.O.C. v. Sears, Roebuck & Co*., 417 F.3d 789, 803 (7th Cir. 2005) (quoting *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996)).

Metra contends that even if De Hoyos is disabled within the meaning the ADA, he has not offered evidence that would allow a reasonable jury to find that Metra was aware of his disability. The Court agrees only with respect to De Hoyos's depression. There is no evidence that any of De Hoyos's supervisors were aware of his underlying condition or its effects, nor is there evidence that he disclosed any of this to any of them. Instead, De Hoyos appears to contend that Meyer had constructive notice of his depression as of August 29, when De Hoyos e-mailed him and Lang a copy of a doctor's note—on letterhead that read "Mid-America Mental Health LLC"—stating that his Abilify had been discontinued.

It is true that "[w]here notice is ambiguous as to the precise nature of the disability or desired accommodation, *but it is sufficient to notify the employer that the employee may have a disability that requires accommodation*, the employer must ask for clarification." *Sears, Roebuck & Co.*, 471 F.3d at 804 (emphasis added). But the August 29 doctor's note does not identify Abilify as an antidepressant, and the mere fact that the note was on letterhead that uses the words "mental health" cannot be considered sufficient notice, particularly given that no reasonable jury could find that De

17

Hoyos was sending this note to Meyer or Lang as a way "to notify [Metra] that [he] may have a disability that requires accommodation." *Id.*[7] Rather, the record clearly shows that De Hoyos was asked, and intended, to send this note to receive medical clearance from Concentra given the concerns that the side effects he was experiencing from the Abilify could impact his ability to work in a safety-sensitive environment. There is no basis for a jury to find that De Hoyos was sending his doctor's note to disclose his depression, or request an accommodation for it, rather than to obtain medical clearance.

The Court reaches a different conclusion, however, regarding De Hoyos's alternative contention that the effects of the treatment he was receiving for his depression amounted to a cognizable disability. A reasonable jury could find—and in fact it is relatively clear—that De Hoyos's supervisors, and thus Metra, were aware that he was experiencing dizziness, disorientation, and fatigue as the result of a prescribed medication. Metra does not argue otherwise, thus effectively conceding the point. Perhaps for good reason: this is exactly why De Hoyos lost his CDL certification, a fact of which Metra quite plainly was aware.

It is true that De Hoyos effectively removed this disability when he discontinued the Abilify. And there is law to the effect that an "intermittent" or "episodic" impairment does not constitute a disability under the ADA. *See, e.g.*, *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995). But this "rule" was significantly

---

[7] Submitting documentation that "lack[s] specific details about what steps were necessary to reasonably accommodate [an employee]'s disability" does not satisfy the employee's burden to "provide the [employer] with the information it need[s]" to accommodate the employee. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 841 (7th Cir. 2012).

impacted by the 2008 amendments to the ADA, which significantly expanded the definition of disability. *See Gogos*, 737 F.3d at 1172-73. Under those amendments, "a person with an impairment that substantially limits a major life activity, or a record of one, is disabled, even if the impairment is 'transitory and minor' (defined as lasting six months or less)." *See also, e.g.*, *Mata v Deslauriers, Inc.*, No. 21 C 3976, 2023 WL 2665441, at *4 (N.D. Ill. Mar. 28, 2023).

For these reasons, Metra is not entitled to summary judgment on this basis.

### 3. Qualified individual/reasonable accommodation

The next question is whether a reasonable jury could find that De Hoyos is not a *qualified* individual within the meaning of the ADA. The ADA defines the term "qualified individual" to mean "an individual who, *with or without reasonable accommodation*, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). *See Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 292-93 (7th Cir. 2015) (an employee cannot prevail on his ADA claim even if the employer refused to interact with him if no reasonable accommodation was available that would enable him to work). Because a reasonable accommodation can, under the statute, render a person "qualified," *see* 29 U.S.C. § 794(a), this point merges with De Hoyos's contention that Metra failed to accommodate his disability.

De Hoyos held the position of CDL signalman driver when he was medically disqualified from having a CDL and then temporarily taken out of service. The parties do not dispute that having a CDL is an essential function of that particular job. Thus, Metra contends that De Hoyos's inability to hold a CDL with or without an accommodation precludes him from being considered a qualified individual. De Hoyos

19

contends that, as an accommodation for his disability, Metra should have allowed him to work without a CDL—either in the CDL signalman driver role or in a role that did not require a CDL—or at least should have given him the same thirty-day period that it gives new signalman drivers to obtain a CDL. And in fact, De Hoyos did have his CDL reinstated on September 9, 2019, which was within the thirty-day period that began on August 12, 2019 (the day he began working as a signalman driver).

The Court agrees with Metra's contention that "an employer can apply 'qualification standards' that deny a job to an individual with a disability as long as those standards are 'job-related and consistent with business necessity.'" Def.'s Mot. for Summ. J at 7 (citing 42 U.S.C. § 12113(a); 29 C.F.R. § 1630.15(b)(1); and *Bay v. Cassens Transport Co.*, 212 F.3d 969, 974 (7th Cir. 2000). De Hoyos contends, however, that "[o]ther employees were also permitted to work in the Signalman Driver without a CDL . . . . [and that] [t]he only requirement was that a Signalman Driver had 30 days from when he started the position to obtain a CDL." Pl.'s Resp. at 9. A reasonable jury could find that, with this same accommodation, De Hoyos would have been a "qualified individual." It is true, as Metra contends, that the thirty-day rule in Appendix K of the CBA applies only to signalmen who, unlike De Hoyos, do not already possess a CDL at the time that they exercise their authority to bid on a position that requires one. But the fact that Metro extended that grace period (for want of a better word) to such employees makes it relatively difficult for Metra to contend that providing the same grace period to De Hoyos would not have been a reasonable accommodation or that it was a matter of "business necessity."

De Hoyos makes other arguments on the accommodation issue, but this one is

sufficient for purposes of the present motion. The Court therefore need not address the others.

For these reasons, Metra is not entitled to summary judgment on counts 1 and 4.

**B.    Discrimination claim – counts 2 and 5**

In counts 2 and 5, De Hoyos alleges that Metra violated the ADA (count 2) and the IHRA (count 5) by terminating him on the basis of his disability and for failing to accommodate his disability.

Both parties address De Hoyos's discrimination claims under the *McDonnell Douglas* burden-shifting framework. *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The Court will therefore do the same. Under this approach, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff makes such a showing, the burden shifts to the employer to provide a "legitimate, nondiscriminatory reason" for its actions. *Id.* Once the employer does so, the burden shifts back to the plaintiff to present evidence that the stated reason is a pretext for discrimination. *Id.* at 804.

**1.    *Prima facie* case**

To establish a *prima facie* case of discrimination, De Hoyos must show that: "(1) he is disabled within the meaning of the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; *and* (4) similarly situated employees received more favorable treatment." *Rooney v. Koch Air*, 410 F.3d 376, 380–81 (7th Cir. 2005) (emphasis added). Metra disputes the first, second, and fourth requirements, contending that De Hoyos is not disabled within

the meaning of the ADA, was not meeting Metra's legitimate expectations because he was insubordinate, and has not offered evidence that would permit a reasonable jury to find that it treated similarly situated, non-disabled employees more favorably than him. A failure of any one of these requirements would entitle Metra to summary judgment.

### a.  Disabled within the meaning of the ADA

Regarding the first requirement, the Court has already concluded that De Hoyos has offered evidence that would permit a reasonable jury to find that he is disabled within the meaning of the ADA.

### b.  Non-disabled, similarly situated employees were treated more favorably

Regarding the fourth requirement, however, the Court agrees with Metra.  No reasonable jury could find that any non-disabled employees were treated more favorably than De Hoyos.  The only contention that De Hoyos makes on this point is that "[o]ther employees had directly disobeyed Swoyer but were not charged with insubordination."  Resp. at 15.  But De Hoyos failed to elaborate further and, more importantly, offers no evidence to support this assertion.  Similarly, in paragraph 51 of De Hoyos's Local Rule 56.1 statement of additional facts, he states—without any citation to the record—that "[o]ther employees refused a supervisors instructions (specifically including Swoyer)."  Pl.'s LR 56.1 SOF, ¶ 51.  Given the lack of support, the Court disregards this contention.  See N.D. Ill. LR 56.1(e)(3) ("a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact.  Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material.").  And completely aside from the local rule, at the summary judgment stage De Hoyos is required to come forward

22

with evidence and cannot rely on unsupported assertions.

In sum, De Hoyos has not offered evidence that would permit a reasonable jury to find that he was treated less favorably than similarly situated, non-disabled employees. Thus, under the *McDonnell Douglas* framework, De Hoyos has failed to make a *prima facie* case of discrimination, and the Court need not address the parties' arguments regarding pretext. Metra is therefore entitled to summary judgment on counts 2 and 5.

## C.    Retaliation claim – counts 3 and 6

In counts 3 and 6, De Hoyos alleges that Metra violated the ADA (count 3) and the IHRA (count 6) by retaliating against him for requesting to return to work, which he appears to characterize as requesting an accommodation. To establish a claim for retaliation, De Hoyos must demonstrate that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007). Although Metra appears to acknowledge that requesting a reasonable accommodation constitutes protected activity under the ADA, it contends that there is no evidence that would allow a reasonable jury to find that De Hoyos made such a request simply by showing up at the Western Ave facility and that—even if he had—there are no facts connecting such a request with any adverse employment action. The Court largely agrees with Metra.

### 1.    Protected activity

Regarding the first element, De Hoyos appears to contend that his attempts to return to work constitute protected activity. On this point, Metra states only that "[e]ven

if [De Hoyos's] request to return to work was a protected activity, [his] insubordination was a significant intervening event." Def.'s Reply at 11 (discussing the causation element of De Hoyos's retaliation claim). The Court takes the words "even if" to mean that Metra does not agree that De Hoyos's attempts to return to work constitute protected activity, but that contention is waived because Metra failed to further develop that argument or cite any caselaw in support of it. *Mahaffey v. Ramos*, 588 F.3d 1142 , 1146 (7th Cir. 2009) ("perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived").

### 2. Adverse employment action and causation

De Hoyos next contends that being barred from the Western Avenue facility on September 3, and later being terminated, constitutes an adverse employment action. Metra does not appear to dispute that either of those actions counts as an adverse employment action under the ADA. Instead, it disputes that there is any causal relationship between them and De Hoyos's protected activity. The Court agrees.

To establish causation in the absence of direct evidence of a retaliatory motive, De Hoyos must offer a "convincing mosaic of circumstantial evidence supporting an inference that a retaliatory animus was at work." *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 495 (7th Cir. 2014) (internal quotation marks omitted). The Seventh Circuit has identified three general categories of circumstantial evidence: (1) "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn"; (2) "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently"; and (3) "evidence that the employer offered a pretextual reason for an

24

adverse employment action." *Cloe v. City of Indianapolis,* 712 F.3d 1171, 1180 (7th Cir. 2013).

De Hoyos focuses primarily on the first and third categories, namely, suspicious timing (discussed below) and pretext. He contends that the following evidence demonstrates pretext: (1) "other employees were not terminated for refusing to follow Swoyer's directions"; (2) "Metra [] deviated from its normal procedures and subjected [him] to a different set of rules and requirements regarding returning to work; (3) "[he] had worked for Metra for 8 years without incident"; and (4) "[t]he police officer who was on the scene for De Hoyos's alleged insubordination testified that [he] was calm and agreed to leave." Pl.'s Resp. at 16. But an examination of the evidence yields no basis for the proposition that De Hoyos being asked to leave the Western Avenue facility, or his termination, were retaliatory.

For reasons explained above, the Court has already rejected the contention that the record shows that other employees were treated more favorably than De Hoyos. Nor has De Hoyos offered any evidence that Metra deviated from its disciplinary policies. As Metra points out, its progressive discipline policy does not apply to insubordination. Def.'s Resp. to Pl.'s LR 56.1 SOF, Ex. 22 at 317 ("Infractions involving any of these rules will result in dismissal regardless of the employee's status in the discipline steps. Theft, *Insubordination*, Physical Altercation, Dishonesty, Violation of Drug and Alcohol Policy.") (emphasis added). Thus, Metra did not act inconsistently with its progressive discipline policy when it terminated De Hoyos for insubordination.

Moreover, the fact that De Hoyos worked for Metra for eight years without incident or that he left calmly when asked to by police also cannot support an inference

25

of pretext when evaluated in context.  It is not "the [C]ourt's concern that an employer may be wrong about its employee's performance, or be too hard on its employee.  Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie."  *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000).  In other words, the Court is not tasked with deciding whether De Hoyos was actually entitled to be at the Western Avenue facility or whether he was insubordinate on September 3.  Instead, the Court must merely decide if there are reasons—based on the record—to doubt the truth of Metra's stated rationales.  The Court concludes that there are not.

As previously noted, Metra's rationale for instructing De Hoyos not to report to work was both consistent and based in a reasonable business concern: namely, workplace safety and the fact that De Hoyos had not yet been medically cleared for service.  And Metra's rationale for De Hoyos's termination was equally consistent and reasonably based on his refusal to follow the many directives he received about both not appearing for work in the first place and leaving the workplace when asked when he appeared in contravention of his supervisors' orders.

Thus, all that remains by way of evidence of causation is timing.  De Hoyos contends that the fact that his being barred from the Western Avenue facility and terminated followed on the heels of his attempts to return to work could allow a reasonable jury to find that Metra took those actions against him in retaliation for seeking to return work.  But "temporal proximity alone is rarely sufficient to establish causation."  *Castro v. DeVry Univ., Inc*., 786 F.3d 559, 565 (7th Cir. 2015) (internal quotation marks omitted).  This is especially true where "a significant intervening event

separat[es] [an employee's protected activity] from [his] discharge." *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011). De Hoyos's insubordination was such a significant intervening event.

In sum, no reasonable jury could find that Metra "would not have taken the adverse . . . action *but for* [De Hoyos's] protected activity." *King v. Preferred Technical Grp.*, 166 F.3d 887, 892 (7th Cir.1999) (emphasis added). As outlined above, Metra had legitimate reasons for barring De Hoyos from reporting for work and terminating him when he appeared anyways, and there is no genuine dispute regarding whether those justifications were pretextual. Thus, even if De Hoyos did engage in protected activity, there is no evidence that would allow a reasonable jury to find that it was causally connected to either his termination or being barred from the Western Avenue station. De Hoyos has therefore not offered evidence that would permit a reasonable jury to find that either his being barred from the Western Avenue station or being terminated were retaliatory within the meaning of the ADA. Metra is entitled to summary judgment on counts 3 and 6.

## Conclusion

For the foregoing reasons, the Court grants Metra's motion for summary judgment [dkt. no. 75] as to counts 2, 3, 5, and 6 but otherwise denies the motion. The case is set for a telephonic status hearing on August 31, 2023 at 8:40 a.m. for the purpose of setting a trial date and discussing the possibility of settlement. The following call-in number will be used: 888-684-8852, access code 746-1053.

Date: August 17, 2023

_____
MATTHEW F. KENNELLY
United States District Judge